IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CORE AVIONICS & INDUSTRIAL, LLC,

     Plaintiff,

CASE NO.:

v.

8:12-cv-01932-JDW-TGW

ALT SOFTWARE, INC.,

     Defendant.

_____/

**DEFENDANT'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

     ALT Software, Inc. ("ALT") opposes Plaintiff Core Avionics & Industrial, LLC's ("CAVI") Motion for Preliminary Injunction [Dkt. 3]. ALT respectfully submits that CAVI has not met its burden of proving that an injunction should issue. First, CAVI will not likely succeed on the merits because ALT is not engaging in the ongoing conduct CAVI alleges; because CAVI does not own Apollo and Genesis, the base software architectures for most of ALT's products; and because its purpose in bringing this action is merely to deflect from its own bad acts.

     Second, no threat of irreparable injury exists, because ALT only seeks to close out existing obligations related to the agreements with CAVI, which are near completion or almost complete, not to get new business. CAVI has already received the information it seeks, and, to the extent CAVI can prove a breach of contract, a contract remedy would suffice.

     Finally, if an injunction issues, serious questions arise as to ALT's ability to sell and develop other software products not sold to CAVI that include the Apollo and Genesis architectures. ALT and its customers also would suffer far more harm than CAVI—ALT's existence as a going concern would be threatened, as it would be forced to breach contracts to

1

which CAVI has long consented, and those breaches would trigger cascading breaches for ALT's customers. The consequences would extend well beyond just ALT and, due to the nature of ALT's customers, the public interest would clearly be disserved. For these reasons, as more fully developed herein, the Court should deny CAVI's Motion.

## I. FACTUAL BACKGROUND

Founded in 1994, ALT is a Canadian entity based in Toronto. It is a leading supplier of custom graphics device drivers. ALT's drivers are used primarily in aircraft cockpit display systems and in hundreds of commercial and military aircraft worldwide.[1]

CAVI is a Delaware entity created in early-June 2011 to receive software sold by ALT, namely four drivers for AMD's ATI Radeon™ E4690 GPU and a non-proprietary parser tool.

A.     ALT's Driver Development Process.

For the past eighteen years, ALT has developed drivers for many different GPU chips manufactured by AMD, Fujitsu, Imagination Technologies, and 3D FX. Over the years, ALT has developed its drivers to be compliant with the OpenGL standards. "OpenGL" (Open Graphics Library) is a software development standard for writing software applications that produce two-dimensional and three-dimensional computer graphics.[2] There are a number of different versions of the OpenGL standard, including OpenGL 1.3, OpenGL ES 2.0 (Embedded Systems) and

---

[1]   A "driver" is a computer program that acts as an interface between an application and a hardware device, such as a graphics processing unit ("GPU"). A GPU is a specialized electronic circuit designed to rapidly build images intended for output to a display, such as a computer's screen. GPU's reside on computer chips. The E4690 is a GPU chip manufactured by AMD-ATI. AMD, Intel, Fujitsu and other companies all make GPU chips.

[2]   OpenGL is managed by the non-profit technology consortium Khronos Group. Anyone can freely download the specification and implement and ship products using the specification completely free of charge, royalty or licensing. http://www.khronos.org/legal/license/

OpenGL SC (Safety Critical). (Decl. of Michael Lin, ¶ 3, 5-6, Ex. 1 hereto).[3]

To develop a driver for a GPU, ALT starts with its architectural source code that is Non-Chip Specific ("NCS code"). Approximately 45% of the code in all of the drivers ALT has developed is NCS code. To the NCS code, ALT adds "Chip-Specific code" ("CS code")—code specifically written for a particular GPU chip, such as the E4690. Over the years, ALT has developed three generations of architectural code that is NCS code. These versions are called Apollo, Genesis, and Orion. They are ALT's proprietary generic architectural code for all drivers, which is organized into modules written to perform functions common to all drivers, so that the final driver program will run with a specific GPU chip. ALT's Apollo, Genesis, and Orion code are the base code of ALT's driver products. (Lin ¶ 6-7, 18.)

Beginning around 2000, and using its Genesis NCS code architecture written to the OpenGL 1.3 standard, ALT wrote and added CS code to develop **OpenGL 1.3 Drivers for the M9, M54 (AMD), Ruby, Carmine and CoralP, (Fujitsu)** GPU chips. Between 2004-2009, ALT developed the Orion drivers. Orion OpenGL SC 1.0 was designed from the ground up to be safety critical and DO – 178B certifiable.[4] Using this Orion safety critical architecture, which is also non-chip specific, ALT created **OpenGL SC Drivers for the M9, and M54 chips**. In around 2007, development of the Apollo NCS code began. Apollo evolved from Orion. The lower level modules were re-architected. The Apollo non-chip specific code was then used to develop **OpenGL ES 2.0 Drivers for the Ruby and M9 chips**. (Lin ¶ 9-11.)

---

[3] The Declarations referenced herein are referred to by the last name of the declarant.

[4] The Genesis drivers were not certifiable as "safety critical." DO – 178B, a document entitled "Software Considerations in Airborne Systems and Equipment Certification" addresses safety issues relating to software used in airborne systems. The Federal Aviation Administration applies DO–178B for guidance in determining whether software will perform reliably in an aircraft.

B.      ALT's Development of the E4690 Drivers.

Beginning in 2007, the Apollo architecture NCS code, was used to develop three drivers for AMD's E4690 GPU: (1) OpenGL SC Driver for the E4690; (2) OpenGL 1.3 Driver for the E4690; and (3) OpenGL SC Driver for the E4690 (the "E4690 Drivers"). The source code for these E4690 Drivers includes proprietary information about the E4690 confidentially provided to ALT by AMD, the maker of the E4690 chip. (Lin ¶ 11-12.)

Using the Genesis architecture, ALT developed a Genesis version of the OpenGL 1.3 for the E4690, in December 2008. Early prototyping was originally done on Genesis to get the driver demonstrable quickly. ALT's first customers, SAAB and Honeywell, received evaluation releases in 2009. In early 2011, they upgraded to the Apollo version once it was fully featured. Both received the OpenGL SC version of the driver. Honeywell subsequently funded non-recurring engineering to develop the OpenGL ES 2.0 (Apollo based) version of the E4690 driver. It was the launch customer for that version in April 2010. Before any agreements were entered into between CAVI and ALT, Honeywell received, under license, the source code for the E4690 Drivers.[5] Aitech Defense Systems, Inc. was the second customer for the Apollo version OpenGL ES 2.0 for the E4690 driver in May 2011. (Lin ¶ 12-13.)

The OpenGL SC, OpenGL 1.3, and OpenGL ES 2.0 Genesis, Orion, and Apollo version drivers are all NCS code. As discussed above, this Non-Chip Specific source code has been used as the architecture for many drivers. Thus, the E4690 Drivers are drivers which consist of (1) NCS code, Apollo and Genesis, and (2) CS code specific to the E4690 GPU chip. The transfer to

---

[5]  Most of ALT's customers receive binary object code releases, but Honeywell and Chinese Aeronautical Radio Electronics Research Institute ("CARERI") have received source code. (Lin. ¶ 13 and 14, Ex. C thereto.)

CAVI of these specific E4690 Drivers did not transfer exclusive rights to the base NCS code, Apollo and Genesis, upon which so many other of ALT's driver products are based. (Lin ¶ 15.)

C.    The Apollo and Genesis Architectures were not Sold to CAVI.

Sometime in early- to mid-2011, ALT began conversations with CAVI's parent company, Channel One Holding, LLC, to sell ALT's E4690 Drivers.  CAVI would be formed as a new entity to receive the E4690 Drivers.  On or about June 21, 2011, ALT and CAVI closed a transaction under which CAVI purchased ALT's E4690 Drivers, and ALT's source code, object code, and user documentation "*to the extent they primarily relate to the Product*" (defined as "the software and related materials described in Schedule 2.1(a)" in the asset purchase agreement ("APA")).[6]

The deal was that ALT would sell the E4690 Drivers to CAVI, CAVI would grant ALT rights to resell and customize[7] E4690 Drivers for end-users, and, in exchange, CAVI would pay $1 million for the E4690 Drivers and for five years, CAVI would pay ALT commissions on its sales of E4690 Drivers.  (Exs. 2-9 hereto.)

The APA, which is to be construed in accordance with the laws of Canada (APA ¶ 11.8), *excluded*:  (c)  "All Intellectual Property of Seller or Seller's Affiliates of any kind not listed on Schedule 2.1(a) or referred in Section 2.1(a)."

The purchased Intellectual Property Rights were transferred by a specific agreement, governed by Canadian law, entitled "Intellectual Property Transfer Agreement/Software Copyright Assignment" (the "SCA," Ex. 3 hereto).  The granting clause transferred:  All of

---

[6]  The APA and other agreements involving that transaction are attached hereto as Exs. 2-10 (collectively, the "Agreements").

[7]  All drivers are "customized" for a particular piece of hardware.  (Lin ¶ 20.)

Assignor's right, title in interest in and to both the tangible and the intangible property constituting the Software ... including all rights under U.S. and Canadian copyright law. 'Tangible property' consists of the documentation and source code.  'Intangible property' consists of rights granted under copyright—the rights to exclude others from copying, distributing, or making derivative works based upon the copyrighted work.[8]

Neither the APA nor the SCA transferred Apollo or Genesis, which were *pre-existing copyrightable works*.  As such, Apollo and Genesis are "excluded assets" as "Intellectual Property ... not listed on Schedule 2.1(a)."  ALT did not sell any rights in its pre-existing works, Apollo or Genesis, or rights in ALT's other driver software products that include the Apollo and Genesis source code.

ALT did not intend to sell, nor did it sell, its Apollo and Genesis architectures to CAVI, core assets of ALT's business.  (Evans ¶ 15.)  The terms of the APA expressly limited the transfer of "intellectual property rights" in ALT's software "to the extent they primarily relate to" the E4690 Drivers.  (Ex. 2 hereto, § 2.1(a) & 2.1(c).)  The SCA, the transferring document, assigned a copyright.  Neither the APA, the SCA, or their attachments—Schedule 2.1(a) and Exhibit A, list the Apollo or Genesis architectures or refer to ALT's other software driver products that include that code, and CAVI is to receive no royalties from ALT's sales of its other products based on Apollo and Genesis.

Consistent with the express limitation on the intellectual property transferred that which "primarily relate[s] to" the E4690 Drivers, the minutes from ALT's board meeting approving the Agreements reflect that ALT sold the "copyright" to one of ALT's "older driver products," not Apollo and Genesis, ALT's core assets.  (Evans ¶ 15, Ex. E thereto.)

---

[8]  See Section II.A.a, *infra*.

D.    ALT's Performance under the License and Reseller Agreements.

Shortly after the Agreements were signed, ALT began providing CAVI with its customer releases and kept CAVI apprised of its progress.  As such, ALT made numerous periodic releases to CAVI, which include all of ALT's customer releases to date.  CAVI was involved in ALT's performance under the Agreements, as well as ALT's performance of its pre-Agreement contracts, such as those with Cobham,[9] Lockheed Martin Corp, CARERI, and Aitech.  Upon request, CAVI was provided with and reviewed copies of agreements with certain customers. CAVI was also extensively involved in ALT's deal with Cobham.  (Lin ¶ 26-27, 31, 53, Ex. F thereto; Evans ¶ 11, Ex. C thereto.)

E.    CAVI'S Bad Acts and Bad Faith.

ALT believes that CAVI conspired and acted with the intent to put ALT out of business.[10] CAVI has also engaged in other bad acts, such as (i) stealing ALT's customer database and "scrubbing" its laptop, (ii) gutting ALT of many of its key people, (iii) breaching its Cobham and commission promises, and (iv) using termination of the Reseller and License Agreements to intimidate ALT's customers and try to force ALT to breach its contracts.

1.    CAVI Takes ALT's Information, Officers, and Key Programmers.

Before the deal closed, ALT's V.P. of Sales, Mr. Daniel Joncas, resigned from ALT to go to CAVI.  Mr. Joncas had been with ALT for 12 years, and was intimately familiar with ALT's business operations and customer relations.  He had personally negotiated most, if not all, of ALT's sales contracts and license agreements.  He became an officer at CAVI before the

---

[9]  Cobham's legal name is Chelton Avionics, Inc. d/b/a Cobham Aerospace Communications.

[10]  As a result, ALT has filed a lawsuit in Canada against CAVI and others.  (Ex. 13 hereto.)

Agreements were signed.  CAVI thus had immediate access to ALT's institutional history, trade

secrets, and the contracts not sold to CAVI under the Agreements.  (Evans ¶ 9-11.)

Despite his resignation, Mr. Joncas still used ALT's e-mail systems and for some time

retained ALT's laptop computer.  Before returning ALT's computer, Mr. Joncas "scrubbed" it by

deleting everything on it, including its operating system.  After Mr. Joncas resigned, he e-mailed

ALT's entire customer and business contacts file to his CAVI e-mail address.[11]  (Evans ¶ 10-14.)

Once at CAVI, Mr. Joncas remained involved with ALT's sales, promotions, and

development of the E4690 Drivers.  He remained involved and knowledgeable of ALT's

performance of agreements with ALT's customers, including Cobham, Lockheed, CARERI, and

Aitech.  Mr. Joncas attended numerous status calls and he approved project issues as they related

to CAVI or the Agreements, including whether particular releases should be "locked" to work

with only a CAVI chip. (Lin ¶ 27, 36.)

In November 2011, ALT's V.P. of Operations, Mr. Steve Viggers, resigned to go to

CAVI.  In March 2012, ALT's Director of Engineering, John McCormick, also resigned to go to

CAVI, along with many of ALT's "Principal Developers" and "Senior Developers."  In April

2012, ALT laid off two other developers who went to CAVI.  Once CAVI hired those people, it

no longer needed ALT, and ALT's relationship with CAVI quickly soured.  (Lin ¶ 34-35.)

2. <u>CAVI Breaches its Contract to ALT regarding Cobham.</u>

In late-2011, ALT and Cobham entered a deal where ALT would sell customized E4690

Drivers to Cobham that were DO-178B certifiable as "safety-critical" for use in aircraft.  CAVI

knew of ALT's deal with Cobham, and CAVI agreed to sell "safety critical" E4690 Drivers to

ALT, which ALT would then customize for, and sell to, Cobham. CAVI understood Cobham's deadline, and thus understood that ALT could not perform its obligations to Cobham unless CAVI agreed to Cobham's deadline and completed its certification work in time for ALT to do its part. CAVI failed to provide its deliverable to ALT, and now refuses to perform under that agreement. CAVI relies on immaterial alleged breaches by ALT as a pretext for not performing. (Id. ¶ 29-35, 42.)

### 3. CAVI Breaches the Commission Agreement.

The Agreements include a Commission Agreement (Ex. 5 hereto), under which CAVI must pay ALT commissions for sales of E4690 Drivers and for sales of chips that have an installed E4690 Driver. Under the Commission Agreement, CAVI must also provide quarterly reports to ALT disclosing such sales. The commissions due under the Commission Agreement constitute a portion of the overall consideration due to ALT in connection with the transfer of ALT's intellectual property under the Agreements. To date, CAVI has not paid ALT a single commission, despite making commission-qualifying sales, or provided ALT with a single report. (Atkinson ¶ 5-7, Ex. 12 hereto.)

### 4. CAVI Tries to Force ALT to Breach Existing Contracts.

After CAVI took ALT's key employees, CAVI declined to renew the Reseller Agreement and notified ALT that the License Agreement would terminate in 60 days. (Lin ¶ 60.) After those had been terminated, CAVI advised ALT, *and ALT's customers*, that ALT could no longer perform its existing contracts. (Atkinson ¶ 8-9.) The existing contracts ALT still needs to perform are described below.

---

[11] Mr. Joncas will likely say that he kept access to ALT's systems and laptop because ALT's former-CEO, Mr. Darryl Parisien, let him. All the same, Mr. Joncas's conduct is wholly

Lockheed.  ALT entered into a contract on June 23, 2011, with Lockheed to customize the E4690 Driver for certain hardware.  The Lockheed agreement involves only the release of binary code.  CAVI has known about this agreement since inception of the Agreements.  While at ALT, and since joining CAVI, Mr. Joncas has been involved with Lockheed.  ALT's formal releases to Lockheed have been provided to CAVI, and ALT's work for that agreement is about 90% complete, with only 150 hours remaining.  If ALT stops work for Lockheed, ALT will be in default of its contract, which may cause Lockheed to default on its contract with its customer.  (Lin ¶ 39, E thereto.)

Aitech.  ALT entered into a contract with Aitech in September 2010 to supply and customize the E4690 for certain hardware.  The Aitech agreement involves only the release of binary code.  CAVI has known about it from the beginning of the Agreements.  ALT's first release to Aitech occurred on April 8, 2011, and was provided to CAVI in July 2011.  ALT's last formal release to Aitech occurred on May 26, 2012, and it was provided to CAVI on August 2, 2012.  The Statement of Work and all of ALT's formal releases have been provided to CAVI.  Only two more formal releases to Aitech are planned, and the project is 93% complete, with only about 92 hours remaining.  If ALT stops work, ALT will default on its contract, and this may cause Aitech to default on its contracts with its customers.  (Lin ¶ 40.)

CARERI.  ALT entered into a contract with CARERI in December 2009.  CAVI has long known about and consented to ALT's obligations to CARERI.  The CARERI agreement involves the release of source code, and only two more formal releases are planned.  The agreement is about 80% complete, with 500 hours remaining.  If ALT stops work, CARERI may default with its customer.  (Lin ¶ 41-52.)

---

improper and likely constitutes unfair and deceptive trade practices.

Cobham.   ALT's obligations to Cobham remain, but ALT cannot proceed without receiving CAVI's deliverables, which CAVI continues to wrongfully withhold.  (Lin ¶ 42.)

## II. ARGUMENT

"A preliminary injunction is 'an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to each of the four requisites.'"[12] CAVI requests that ALT (a) be enjoined "*from any further use, modification, reproduction or disclosure of* the Purchased E4690 Drivers, including the Customized E4690 Drivers, and their source code;" (b) be precluded from "Selling, marketing, promoting, distributing, licensing, researching or developing … software for the AMD E4690 … worldwide for the entire five (5) year period;" (c) be required to "*To return all source code and object code* for the Purchased E4690 Drivers (except that ALT may retain one copy … for ongoing support obligations);" (d) To deliver to Core Avionics and *retain no copies of all revisions, modifications,* updates and documentation;" and (e) be required "To cease any further use of Core Avionics Confidential Information" (which it nowhere defines).  Because CAVI cannot carry its heavy burden, an injunction should not issue.  CAVI's unclean hands described herein also bar equitable relief.[13]

---

[12]   *Reese v. JP Morgan Chase & Co.*, 686 F. Supp. 2d 1291, 1306 (S.D. Fla. 2009).  To obtain relief, CAVI must show:  (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause to the defendant, and (4) that granting the injunction would not disserve the public interest.  *See, e.g., Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)

[13]   *See, e.g., Pilafian v. Cherry*, 355 So. 2d 847, 849-50 (Fla. Ct. App. 1978) (unclean hands barred injunction); *Bradley v. Health Coalition, Inc.*, 687 So. 2d 329, 334 (Fla. Ct. App. 1997) (remanding to determine if employer had unclean hands, which would make an injunction unavailable).

A.   CAVI Will Not Likely Succeed on the Merits of its Claims.

"Good reasons" must exist for finding a substantial likelihood of success on the merits, and merely alleging a "colorable claim" is insufficient.[14]   If a defendant presents a "substantial defense," an injunction should not issue.[15]   ALT has many substantial defenses.

a.   Contract Interpretation under the law of Ontario, Canada.

The APA and SCA, both dated June 21, 2011, contain choice of law clauses providing that they are to be construed and interpreted in accordance with the laws of the Province of Ontario, Canada. (APA ¶ 11.8, Ex. 2 hereto; SCA ¶ 3, Ex. 3 hereto.)  Under Ontario, Canada law, it is well established that a commercial contract is to be interpreted:  (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective; (b) by determining the intention of the parties; and (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties.[16]

The first principle applies where two terms appear to conflict with one another and "the terms will, if reasonably possible, be reconciled by construing one term as a qualification of the other term ... put it another way, where there is apparent conflict between a general term and a specific term, *the terms may be reconciled by taking the parties to have intended the scope of the*

---

[14]   *So. Wine and Spirits of Am., Inc. v. Simpkins*, No. 10-21136-Civ., 2011 WL 124631, at *2 (S.D. Fla. Jan. 14, 2011).

[15]   *Direct Mail Holding, LLC v. Bush*, No. 8:12-CV-145-T-30EAJ, 2012 WL 1344823, at *7 (M.D. Fla. Mar. 8, 2012) *adopted and confirmed*, 2012 WL 1344726 (Apr. 18, 2012) (denying preliminary injunction where defendant presented a substantial defense to breach of contract and misappropriation claims); *see Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001) (reversing finding of likelihood of success where defendant had a substantial defense).

*general term to not extend to the subject-matter of the specific term.*[17]  Thus, in the APA, the general term "all right, title and interest" (§ 2.1) to Seller's Intellectual Property Rights is narrowed and clarified by the phrase "*to the extent they primarily relate* to the Products" (§ 2.1(a)).

The second and third principles above flow from the presumption that parties mean what they write in a contract, but that the "context" of its drafting will inform the meaning of its terms.[18]  In the context and under the circumstances in which these parties entered into the Agreements, ALT was well aware that the Apollo and Genesis architecture was used in ALT's drivers for many other GPU chips, as was Mr. Juncas.  (Lin ¶ 15-16.)

Under Canadian law, where a contract's terms can reasonably bear multiple interpretations, the court may use other mechanisms to resolve the ambiguity. One method for dealing with ambiguity is to construe the contract "in a fashion that accords with sound commercial principles and good business sense, and that avoids a commercial absurdity."[19]  Another mechanism for dealing with an ambiguous contract is to consider the subsequent

---

[16]  *Ventas, Inc. v. Sunrise Sr. Living Real Estate Inv. Trust* (2007), 85 O.R. (3d) 254 at 263 (C.A.) [citations omitted]; *see also, 3869130 Canada Inc. (c.o.b. I.C.B. Distrib. 2001) I.C.B. Distrib. Inc.*, [2008] O.J. No. 1947 at para. 31 (C.A.).

[17]  *BG Checo Int'l Ltd. v. British Columbia Hydroand Power Auth.*, [1993] 1 S.C.R. 12 at para. 9 [citations omitted].

[18]  *Dumbrell v. The Regional Group of Cos.*, [2007], 85 O.R. (3d) 616, at para. 52, (The meaning of a document is derived not just from the words used, but from the context or circumstances in which the words were used).  See also *Hawley v. N. Shore Mercantile Corp.* [2009] O.J. No. 3956 at para. 27 (C.A.); Angela Swan, *Canadian Contract Law* 2d ed. (Markham, Ont.: Butterworths, 2009) at 610-11; and *Gilchrist v. W. Star Trucks Inc.*, [2000] B.C.J. No. 164 (C.A.) at paras. 17-18 ("Only when the words, viewed objectively, bear two or more reasonable interpretations, may the court consider other matters such as the post-contracting conduct of the parties.").

[19]  *Ventas, Inc.*, *supra* n. 16.

conduct of the parties.[20]  Where a transaction involves the execution of several documents that form parts of a larger composite whole—like a complex commercial transaction—and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.[21]

The APA and SCA do not transfer the Apollo and Genesis software to CAVI. The contracts provide for the transfer of the "Products," E4690 Drivers—not the architectural code—Apollo or Genesis. Section 2.2 of the APA explicitly *excludes* the transfer of anything "not listed or referred to on Schedule 2.1(a)." The fact that Apollo and Genesis are not mentioned speaks volumes about the parties' intentions.

b.  <u>CAVI's Trade Secrets Claim is Actually a Claim Arising Under Copyright Law</u>.

Under the SCA, governed by Canadian law, what was assigned was the "tangible and intangible property constituting the Software...including all rights under the copyright laws of the U.S. and Canada." Under copyright law, the copyright owner has certain exclusive rights. As pertains to software, these are rights (a) to reproduce the work; (b) to prepare derivative works; (c) to distribute copies. 17 U.S.C. § 106; *R.S.C.* 1985, Ch. – 42, § 3.(1). The E4690 Drivers are themselves "derivative works." The E4690 Drivers are composed of pre-existing work—the Apollo and Genesis architecture, and the code that was added and specific to the E4690 chip. (Lin¶ 18.) The transfer of a derivative work conveys no rights in the pre-existing work. 17 U.S.C. § 103 (b) provides that the copyright in a derivative work: "does not imply any

---

[20] *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.*, [1995] O.J. No. 1609 at paras. 21-22 (C.A.) [Citations omitted]. (Subsequent conduct may be used to interpret a written agreement because "it may be helpful in showing what meaning the parties attached to the document after its execution" and "there is no better way of determining what the parties intended than to look to what they did under it.").

[21] *Salah v. Timothy's Coffees of the World Inc.,* [2010] O.J. No. 4336, at para. 16 (C.A.).

exclusive right in the pre-existing material.  The copyright in such work is independent of, and

does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright

protection in the pre-existing material." Thus, CAVI did not buy the preexisting works—Apollo

and Genesis.

CAVI seeks to avoid this conclusion by asserting it bought a "trade secret"—the source

code.  By doing so, and asking this Court to enjoin all use of the source code, it avoids (1) any

examination of the copyright issues;[22] (2) the substantial preemption issue raised, because

copyright is a question of federal law and may preempt state law;[23] and (3) questions as to

whether this Court has jurisdiction to address the copyright issues presented because the

copyright is not registered in either Canada or the United States.[24]  Given Plaintiff's avoidance of

---

[22] The case *Liberty Am. Ins. Group, Inc. v. Westpoint Underwriters, LLC,* 199 F. Supp. 2d 1271, 1286 and 1288-1290 (M.D. Fla. 2001), relied on by CAVI, found the software to be a trade secret, but found no misappropriation and denied preliminary injunction for failure to: (1) establish the likelihood of success on the merits of its copyright infringement claim and (2) establish the protectability of its source code.

[23] *Foley v. Luster,* 249 F.3d 1281, 1285 (11th Cir. 2001) ("Copyright law preempts only those state law rights which may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law," quoting *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir. 1992).  *Stewart Weitzman, LLC v. Micro Computer Res.,* 542 F.3d 859, 864 (11th Cir. 2008) (dismissing declaratory judgment action concerning software and noting that the Eleventh Circuit has not decided whether the Copyright Act has complete pre-emptive effect; case dismissed for failure to register copyright); *Nikish Software Corp. v. Manatron, Inc.,* No. 1:07-cv-0358, 2010 WL 5099281, at *10 (S.D. Ind. Dec. 8, 2010) (summary judgment granted in case alleging misappropriation of trade secret source code "[b]ecause the crux of these claims is copyright infringement.") *Bella Builders, Inc. v. Minghenelli,* No. 2:08-cv-144, 2008 WL 4569880 (MD Fla. Oct. 14, 2008) (finding preemption and dismissing claim of conversion based upon creation of derivative architectural plans).

[24] *St. Luke's Cataract and Laser Inst. v. Sanderson,* 573 F.3d 1186, 1201 (11th Cir. 2009) ("17 U.S.C. § 411(a)'s registration requirement is a jurisdictional prerequisite to a copyright infringement suit"); *Stewart Weitzman, LLC,* 542 F.3d at 863 (because software program was not registered, district court lacked subject matter jurisdiction).

these issues—is the source code to the E4690 Drivers a "trade secret" and has ALT misappropriated it—ALT will address them.

### c.   The Source Code is not CAVI's "Trade Secret."

Although source code may be a trade secret,[25] the E4690 source code at issue is not. Under Florida statute 688.002, a trade secret must not be "generally known to and not...readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use." Information that is readily accessible to third parties cannot qualify for trade secret protection."[26] The source code for the Genesis and Apollo drivers has been provided to third parties who can benefit from their use and these disclosures were made prior to the APA. (Lin ¶ 14, 41.) First, CARERI has the source code for the Genesis version of the E4690 Drivers. Second, Honeywell, who paid for development work for the E4690 has the E4690 Driver source code and it can obtain economic value from its lawful use. (Lin ¶ 13-14 and Ex. C.) Third, ALT, the author of Apollo and Genesis, has the source code for all of the Apollo and Genesis drivers that it has developed. ALT did not "misappropriate" that source code. The termination of the License Agreement does not affect the fact that ALT is still in lawful possession of the source code and did not "misappropriate" the source code.[27]

---

[25]   However, the "trade secrets" within the software must be identified. *Idx Sys. Corp. v. Epic Sys. Corp.,* 285 F. 3d 581, 583-584 (7th Cir. 2002) (43-page description showing features of the software package insufficient to separate the trade secrets from other information that goes into any software package); *MSCI Inc. v. Phillip Jacob,* 945 N.Y.S. 863, 865 (N.Y. Sup. Ct. 2012) Plaintiff required to identify trade secrets within the source code).

[26]   *Am. Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1410 (11th Cir. 1998.) *Accord, WellCare Healthplans, Inc. v. H. L. Preitauer,* No. 8:12-cv-713, 2012 WL 1987877 (M.D. Fla. May 23, 2012) (information readily available to third parties can not qualify for trade secret protection).

[27]   *Cappa v. CrossTest, Inc.,* Nos. A113327, A114548, 2008 WL 821637, at *12 (Cal. App Mar. 28, 2008) (mere possession of validly acquired information regarding trade secrets for producing

d.  The Source Code has Not been "Misappropriated."

CAVI cites two acts of purported misappropriation:  (1) ALT disclosed the source code to CARERI and (2) "ALT has also misappropriated CORE Avionics trade secrets by continued use of the source code to develop new programs, including the HD 3000 Driver."

ALT has disclosed source code to CARERI.  Such disclosures were made both before and during the term of the License Agreement with CAVI's knowledge and consent during the license term. (Lin ¶ 14, 41.)  There has been no misappropriation by unauthorized disclosure.

The second act of misappropriation, "continued use of the source code to develop new programs, including the HD 3000 Driver" is also the subject of Count IX of the CAVI's Complaint that it owns ALT's HD3000 development work because it is a "derivative work" of the E4690 Drivers.  That claim is clearly preempted by federal law, the Copyright Act.[28]  As stated by the Eleventh Circuit in *Bateman v. Mnemonics Inc.,* courts should be wary of a "state law claim that in actuality is nothing more than a dressed up version of a copyright infringement claim."[29]  Where, as here, the "misappropriation" alleged to have occurred is the creation of a "derivative work," the HD3000 driver, the act complained of is clearly a claim that can only be addressed under the Copyright laws of the United States and Canada.[30]

---

software, does not establish use of a trade secret for purposes for a cause of action for misappropriation and asserting a legal claim to the confidential information likewise does not amount to misappropriation).

[28]  CAVI recognizes this in paragraphs 216 and 217 by citing to rights to prepare derivative works under U.S. and Canadian law (Compl. ¶ 216-217.)

[29]  73 F.3d 1532, 1550 (11th Cir. 1996) (Registered source code copyright infringement claim remanded, misappropriation of trade secret claim reversed with instructions to enter judgment for defendant); *Stewart Weitzman, LLC, supra.*

[30]  *See, Atpac, Inc. v. Aptitude Solutions, Inc.,* 787 F. Supp. 2d 1100, 1114-1115 (E.D. Cal. 2011) ("source code falls under the 'subject matter' of the Copyright Act").

Florida Statute § 688.03 provides for "injunctive relief against actual and threatened misappropriation." That is true. But, as discussed below, ALT is not selling the E4690 Drivers.

e.   The Specific Performance and Injunction Claims Will Likely Fail.

CAVI's antecedent material breach of the Commission Agreement by not paying commissions (Atkinson ¶ 7) and the Reseller Agreement by breaching obligations regarding the Cobham transaction (Lin ¶ 29-35, 53) excuse any subsequent breach of the Agreements by ALT.[31]  Those breaches provide ALT with a "substantial defense" and show CAVI's claims will likely fail.

Despite CAVI's breaches, ALT has provided CAVI with all of the formal customer releases that CAVI seeks.  (Lin ¶ 43-50.)  Since termination of the Reseller Agreement on June 21, 2012, ALT has not pursued any new business for E4690 Drivers, but instead has actually advised its customers that any *new* business must be done through CAVI.  (Atkinson ¶ 13, Ex. A thereto).  No injunction is necessary, nor would one be proper, on those points.

The critical issue, however, is whether this Court should enjoin ALT from performing contracts that existed <u>before</u> the termination of the Reseller and License Agreements.  CAVI takes the position that after it gave ALT 60-days' notice of termination of the License Agreement (Ex. 10 to Pl's Compl.), ALT had to stop work on all of its contracts, unless the work was

---

[31]   *E.g., Bush*, 2012 WL 1344823, at \*5 (employer's failure to pay commissions relieved employee of non-competition agreement); *Simkins*, 2011 WL 124631, at \*7 (denying injunction where employer failed to pay bonus and stating "a party is entitled to enjoin the breach of a contract by another unless he himself has performed what the contract requires under him so far as possible; if he himself is in default ... he has no standing in equity"); *Bradley*, 687 So. 2d at 333 (reversing injunction and remanding on issue of material antecedent breach for nonpayment). Because the Agreements concern the same subject matter, were executed at the same time, by the same parties, they must be construed together. *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. Ct. App. 2002) (viewing lease agreement, maintenance agreement, and equipment acquisition agreement as "one integrated document"); *Bush*, 2012 WL 1344823, at \*5.

maintenance.  (Lin ¶ 37.)  But the "termination at will" provision of the License Agreement (§ 9.1.1) must be read consistent with the duty of good faith, fair dealing, and commercial reasonableness.[32]  As the contract vests CAVI with discretion to terminate, but provides no standards for CAVI's exercising of that discretion, CAVI's duty to act in good faith limits its ability to act "capriciously to contravene the reasonable contractual expectations" of ALT.[33]  Those implied duties thus prevent CAVI from terminating the License Agreement in such a way that causes ALT to breach the very contracts it entered or performed with CAVI's full knowledge and consent.  Otherwise, the central purpose of the Agreements would be frustrated.[34]  To be clear, ALT does not argue CAVI could not terminate the License Agreement, only that when CAVI did, it had to do so in good faith, and thus permit ALT to finish existing contracts.

For instance, License Agreement (§ 2.1, 2.4) allowed ALT to use the E4690 Drivers' source code to fulfill obligations to "End-User customers, as per the Reseller Agreement." The Reseller Agreement (§ 3.1) required ALT to "market and promote" the E4690 Drivers, as ALT intended to "sell" the products or services (§ 1.1).  The purpose of the Agreements thus could not be fulfilled unless ALT could fully perform the contracts the parties expected ALT to pursue.

In an indirect way, the License Agreement (§ 9.2) suggests that the parties intended for ALT to satisfy pre-termination obligations, but the scope of what ALT can do is unclear.  That

---

[32]  *E.g., Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. Ct. App. 1999) (reversing summary judgment on plaintiff's claim that defendant breached the duty of good faith, fair dealing, and commercial reasonableness by improperly exercising its discretion); *In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (M.D. Fla. Bankr. 2009) (party's exercise of discretion in terminating agreement violated Florida's implied covenant of good faith).

[33]  *Cox*, 732 So. 2d at 1097.

[34]  *See, e.g., Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555, 2004 WL 5504978, at *50 (S.D. Fla. Jan. 5, 2004) ("courts in Florida and in this Circuit have focused on whether the discretionary decision frustrated the central purpose of the contract").

section says that ALT may retain copies of the source code to continue to provide "support" for End-Users.  The word "support," however, is undefined, and thus is ambiguous.  Because the License Agreement contemplated development obligations (which, due to the nature of the work, would undoubtedly extend beyond 60 days), and because the Reseller Agreement required ALT to market and sell those services, it is commercially reasonable to read "support obligations" to mean fulfilling existing contracts, regardless of whatever distinction exists between "support" or any other obligation.[35]  Reading the Agreements any other way is absurd, as it would have been commercially unreasonable for ALT to contract with CAVI and thereby allow CAVI unilaterally to force ALT to breach a contract with a large defense contractor, like Lockheed, on a mere 60-days' notice.  Hence, the only reasonable reading of the Agreements permits ALT to close out its pre-termination contracts with Lockheed, CARERI, and Aitech.[36]  Those contracts are more than 80% complete, and given CAVI's knowledge of and acquiescence to those contracts, CAVI's claim of irreparable harm is disingenuous.  (Lin ¶ 39-41.)

> i.  ALT has Complied with § 3.13 of the Reseller Agreement and § 3.1.16 of the License Agreement.

CAVI complains that ALT breached § 3.13 of the Reseller Agreement and § 3.1.16 of the License Agreement by not transmitting "revisions, modifications, and updates to the Products" to CAVI on a monthly basis.  (Pl's Br. p. 18).  CAVI then goes on to discuss some of those

---

[35] *See Sutter Ins. Co. v. Applied Sys., Inc.*, 393 F.3d 722, 726 (7th Cir. 2004) ("Commercial reasonableness is a useful guide to the interpretation of an ambiguous contract"); for authority that the Agreements must be read together, see n. 31, *supra*.

[36] *See e.g., James v. Gulf Life Ins. Co.*, 66 So. 2d 62, 63 (Fla. 1953) ("the court will likewise endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other"); *King v. Bray*, 867 So. 2d 1224, 1227 (Fla. Ct. App. 2004) ("where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner").

particular items it thinks it is missing.  As explained in Mr. Lin's Declaration, ALT has provided

CAVI with all of ALT's formal customer releases to date regarding the E4690 GPU.  (Lin ¶ 43.)

> ii.  ALT has Complied with § 11.3 of the Reseller Agreement and § 9.2 of the License Agreement.

CAVI complains that ALT has not provided several-binary code releases, a password, and

some "documentation."  (Pl's Br. p. 19-20)  Mr. Lin's Declaration shows that CAVI, in fact, has

the formal releases and documents released to ALT's customers, to the extent they exist.  (Lin ¶

43, 45-50.)  CAVI also says it is unaware of ALT's ongoing "support obligations" (Pl's Br. p.

20), but CAVI has all of ALT's contracts as well.  (Lin ¶ 51.)[37]

> iii.  ALT has Complied with § 3.1.15 of the License Agreement.

CAVI asserts that ALT sold source code to CARERI in violation of the License

Agreement.  (Pl's Br. p. 20; Compl. ¶ 100; Joncas ¶ 16-22)  CAVI's problem is that the CARERI

sales agreement arose in December 2009, well before the Agreements.  (Lin ¶ 41.)  CAVI knew

about it through Mr. Joncas, who was extensively involved with ALT's relationship with

CARERI before and after his resignation, and CAVI has never objected to ALT's performance,

including the release of source code.  (Id. ¶ 14, 27, 41, 52.)  CAVI has waived, and is further

estopped from raising, any objection to ALT's release of source code to CARERI.[38]

CAVI claims harm from ALT's entry into a license agreement to permit Cobham to use

the source code to certify the software.  (Pl's Br. p. 20; Viggers ¶ 25)  But, CAVI knew about the

---

[37]  Furthermore, ALT's former VP of Sales, former VP of Operations, former Director of Engineering, two of ALT's Principal Developers, three of ALT's Senior Developers, and one of ALT's Intermediate Developers, all work for CAVI.  (Lin ¶ 34.)  CAVI will say ALT waived those people's NDA's and restrictive covenants, and thus CAVI knows a lot about ALT.

[38]  *See, e.g., MDS (Canada), Inc. v. RAD Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1311-12 (S.D. Fla. Sept. 30, 2011) (finding that waiver and estoppel barred licensor's claim against

Cobham license agreement since at least December 6, 2011, and still went ahead with ALT on the Cobham transaction.  (Lin ¶ 53, Ex. E thereto.)  Waiver and estoppel also apply here.[39]

CAVI relies on self-serving hearsay to claim it needs to stop ALT from selling the source code, (Pl's Br. p. 20), but such an injunction is not necessary because ALT is telling customers in writing that it cannot sell software for the E4690 GPU.  (Atkinson ¶ 13, Ex. A thereto.)

### iv.   ALT Is Not Violating the Restrictive Covenant.

CAVI says ALT has violated the restrictive covenants of the APT by releasing driver software to ENSCO iData after the termination of the Agreements.  (Pl's Br. p. 22; Viggers ¶ 15; Joncas ¶ 12.)  ALT disputes that it was not entitled to do so because ALT's obligation to perform arose pre-termination, and when that obligation arose CAVI consented.  In any event, no irreparable harm can be claimed from these facts.

CAVI complains that ALT has had technical review meetings with Tech Source, Inc. and Mercury Computer Systems, Inc. (collectively "Mercury") for the development of customized E4690 Drivers.  (Pl's Br. p. 22; Joncas ¶ 11.)  Because CAVI's brief is based on hearsay testimony, it should come as no surprise that CAVI is wrong on the facts.  The last time ALT met with Mercury was in July, and during that meeting ALT actually asked Mercury to deal with CAVI going forward.  (Atkinson ¶ 13.)

CAVI contends that ALT has requested authorization to continue to do software

---

licensee of certain technology where licensor was "at all times fully aware" of licensee's breach and yet never notified licensee of its material breach or terminated the agreement).

[39] See MDS, 822 F. Supp. 2d at 1311-12.  Furthermore, CAVI's objection arose in bad faith on May 17, 2012, only after it had taken ALT's key programmers in March 2012, after it declined to let ALT perform certification work around March 2012, and after ALT had filed the Canada suit on May 9, 2012.  (Lin ¶ 31.)  Regardless, there is nothing to enjoin and CAVI has suffered no harm—ALT has nothing to release because CAVI refuses to perform its part of that deal.  (Id. ¶ 47.)

engineering and customization development for Lockheed for the Purchased E4690 Drivers. (Pl's Br. p. 22; Joncas ¶ 30.)   ALT did ask if CAVI agreed ALT could perform its pre-termination obligations, but, as further evidence of bad faith, CAVI withheld consent. (Lin ¶ 56.)

Finally, CAVI complains that ALT says it is selling development services for the AMD Radeon "family of GPUs." (Verified Compl. ¶ 102 & Ex. 15 & 16.)  Nothing restricts ALT from selling software for the AMD GPUs.  The restrictive covenant at issue relates only to the E4690 GPU, not to AMD's other GPUs, such as Radeon 92000, M9, and M54.  (APA § 8.2, Ex. 2 hereto (applying only to "product for the ATI E4690 GPU"); Lin ¶ 57.)

> B.   CAVI Has Not and Will Not Suffer Irreparable Injury.

There must be a "substantial threat of impending injury" for an injunction to issue. *Bush*, 2012 WL 134823, at *7.  No such threat exists.  CAVI contends that ALT engaged in "unauthorized competition" that has made it difficult for CAVI to do business in the marketplace. (Pl's Br. p. 23)  This is simply not true. (Atkinson ¶ 13; Lin ¶ 54.)  ALT's statements and conduct confirm that CAVI cannot show a likelihood of irreparable injury.[40]

CAVI's problems perhaps arise from its own conduct, as ALT has received complaints about CAVI's Mr. Joncas showing up unannounced, and hand-delivering letters that caused confusion, panic, and uncertainty. (Atkinson ¶ 10.)  Based on what CAVI has done to ALT—and is doing to others—it is not unreasonable for large defense companies to be cautious.

---

[40] *E.g., Medimport, S.R.L. v. Cabreja*, No. 12-22255, 2012 WL 3632580, at *2, *11 (S.D. Fla. Jul. 31, 2012) ("the cessation of the challenged conduct and the defendant's representation that the conduct will not resume 'obviates the need for a preliminary injunction … because [plaintiff] cannot show any likelihood of irreparable injury without the preliminary injunction.'" (citation omitted)); *Bush*, 2012 WL 1344823, at *8 (noting *arguendo* there was nothing to enjoin where sensitive materials had already been returned).

CAVI will also not suffer "impending injury," if ALT closes out existing contracts. Those contracts are more than 80% complete, (Lin ¶ 39-41), and CAVI previously consented to ALT's performance of them. (Id.) ALT's further use of Apollo and Genesis also will not cause CAVI injury, as those architectures already exist in other products that ALT did not sell to CAVI. (Id.) And CAVI doesn't say it will suffer from ALT working with those products.

C.     An Injunction Would Devastate ALT and Harm the Public.

It is untrue that ALT "can claim no legitimate injury from being estopped." (Pl's Br. p. 24.) Any injunction that causes ALT to breach pre-termination contracts could result in enough liability to ALT and its customers to put ALT out of business. (Lin ¶ 39-41, 58, 60; Evans ¶ 20.) If ALT cannot use its Apollo and Genesis architecture, it must stop work on its other Apollo and Genesis products[41] and stop developing new drivers from products not sold to CAVI. (Lin ¶ 59-60.) That would have serious consequences to ALT. (Lin ¶ 60.) It would cause ALT to forfeit valuable work ALT has already done on new products based on Apollo and Genesis. (Id.) ALT would have to create a new core architecture upon which to develop drivers, which could cost millions. (Id.) And although eliminating a competitor would benefit CAVI, it would disserve the market. Forcing cascading breaches by ALT and its customers would result in untold economic waste, and the public interest would suffer, particularly due to the possibility of delays or defaults on public contracts.

---

[41] Those products include Apollo OpenGL ES 2.0 G2 Plus (M9), Apollo Open GL ES 2.0 Ruby; Genesis OpenGL 1.3 M9; Genesis OpenGL 1.3 Carmine; Genesis OpenGL 1.3 CoralP; Genesis OpenGL 1.3 Datascope R500 (M9); Genesis OpenGL 1.3 GS; Genesis OpenGL 1.3 GS Plus (M9); Genesis OpenGL 1.3 M9; Genesis OpenGL 1.3 Radeon 9200 PCI; and Genesis OpenGL 1.3 XMC-M54. (Lin ¶ 59.)

D.      If CAVI Receives an Injunction, It Should Post a Multi-Million Dollar Bond.

If an injunction issues, CAVI should post a bond to cover ALT's value as a business and the liability ALT would suffer if it must breach its contracts.[42]   ALT estimates the value of its business to be between CA $4.1 and 6.2 million, (Evans ¶ 16) and the liability surrounding its contracts to be enormous, considering the defense contractors dependant on ALT's work, (Evans ¶ 17-19.)  As such, a bond should post for at least US $6.3 million.[43]

## CONCLUSION

For all the foregoing reasons, ALT respectfully requests that this Court deny CAVI's Motion.

---

[42]  *See Cont'l Group, Inc. v. KW Prop. Mgmt., LLC*, No. 09-060212-CV, 2009 WL 3644475, at *7-8 (S.D. Fla. Oct. 30, 2009) (executive's declaration showing loss of business opportunity and other damages provided rational basis for awarding $1 million bond).

[43]  *See Mead Johnson & Co. v. Abbott Labs*, 201 F.3d 883, 887-88 (7th Cir. 2000) (admonishing the trial court for setting bond too low in light of the substantial risk of loss identified by defendant, and explaining that courts should "err on the high side" to avoid "irreparable harm" to the wrongfully enjoined).

Dated:  September 27, 2012

Respectfully submitted,

By: /s/ Scott S. Gallagher
Scott S. Gallagher
Florida Bar No. 0371970
E-mail:  ssgallagher@sgrlaw.com
Smith, Gambrell & Russell, LLP
Bank of America Tower
50 North Laura Street, Suite 2600
Jacksonville, FL 32202
Telephone:  (904) 598-6100
Facsimile:  (904) 598-6207

Joyce B. Klemmer
Georgia Bar No. 425116
Wm. Parker Sanders
Georgia Bar No. 626020
1230 Peachtree Street, N.E.
 Suite 3100, Promenade
Atlanta, GA 30309-3592
Telephone: (404) 815-3500
Facsimile: (404) 815-3509

*Attorneys for Defendant ALT Software, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of September, 2012, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

Richard H. Martin
Richard.martin@akerman.com

Wesley D. Tibbals
Wesley.tibbals@akerman.com

Jason L. Margolin
Jason.margolin@akerman.com

 /s/ Scott S. Gallagher
Attorney